## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| KELLY J. CONRAD, | ) | CASE NO. 5:20-CV-01509 |
| | ) | |
| Plaintiff, | ) | JUDGE JOHN R. ADAMS |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| ANDREW SAUL, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Kelly J. Conrad, ("Plaintiff" or "Conrad"), challenges the final decision of

Defendant, Andrew Saul,[1] Commissioner of Social Security ("Commissioner"), denying  his

applications  for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI")

under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act").

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a

Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends

that the Commissioner's final decision be VACATED AND REMANDED FOR FURTHER

CONSIDERATION CONSISTENT WITH THIS OPINION.

---

[1] On June 17, 2019, Andrew Saul became the Commissioner of Social Security.

1

# I.   PROCEDURAL HISTORY

On  February 10, 2017, Conrad  filed an application for  DIB, and SSI alleging a disability onset date of June 15, 2016 and claiming she was disabled due to pseudotumor cerebri, depression, psoriatic arthritis, and anxiety.  (Transcript ("Tr.") at 235-47, 271.)  The applications were denied initially and upon reconsideration, and Conrad  requested a hearing before an administrative law judge ("ALJ").  (Tr. 190.)

On April 16, 2019, an ALJ held a hearing, during which Conrad , represented by counsel, and an impartial vocational expert ("VE") testified.  (Tr. 78.)  On April 16, 2019, the ALJ issued a written decision finding Conrad was not disabled.  (Tr. 25.)  The ALJ' s decision became final on May 26, 2020, when the Appeals Council declined further review.  (Tr. 1.)

On July 8, 2020, Conrad filed her Complaint to challenge the Commissioner's final decision. (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 14, 17, 18.) Conrad asserts a single assignment of error:

(1)   The ALJ's decision is not supported by substantial evidence because it does not address case-determinative conflicts that exist between the medical opinions of the State Agency psychological consultants and the RFC finding.

(Doc. No. 14 at 11.)

# II.   EVIDENCE

## A.   Personal and Vocational Evidence

Conrad  was born in 1977 and was a "younger" individual under social security regulations at all relevant times.  (Tr. 32.)  *See* 20 C.F.R. §§ 404.1563 & 416.963.  She has at least a high school education and is able to communicate in English.  (*Id.*)  She has past relevant work as an  insurance salesperson and a telemarketer.  (Tr. 31.)

2

**B.     Relevant Medical Evidence**[2] **- Mental Impairments**[3]

On March 10, 2016,[4] Conrad presented for an initial diagnostic assessment at CommQuest Services, Inc.. She reported a childhood history of physical abuse. (Tr. 380.) She reported the following depressive symptoms: exhausted, sleeps more, trouble concentrating, irritability, no interest in doing anything. (*Id.* at 382.)  She reported the following anxiety symptoms: daily panic attacks, shaky, racing thoughts, numbness, heart racing, shortness of breath, and tingling. (*Id.*) Conrad was diagnosed with major depressive disorder, recurrent, moderate; panic disorder; and generalized anxiety disorder.  (*Id.* at 383.)  She was referred to begin counseling, medication management, and crisis support as needed. (*Id.* at 384.)

On March 22, 2016, Conrad began treatment at CommQuest Services with Marissa Ragon, CNP.  (*Id.* at 405.)  She "[r]eported feeling depressed and anxious for as long as she can remember," and had lost several jobs due to her depression, which was sometimes debilitating to the point that she could not get out of bed.  (*Id.*)  Nurse Ragon noted Conrad was neat and well-groomed, with sad mood and constricted affect, logical thought processes, and normal speech.  (*Id.* at 406.)

On May 25, 2016 Conrad returned to Nurse Ragon, and reported having anxiety attacks and feeling agoraphobic because she was afraid of having a panic attack in public.  (*Id.* at 399.)  She also reported losing a job after two months, and feeling depressed.  (*Id.*)  Nurse Ragon noted Conrad was

---

[2]     The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

[3]     Although the ALJ found that Conrad has both mental and physical severe impairments, only the evidence related to mental impairments is disputed in this case, and therefore no evidence relating to Conrad's physical impairments was presented by the parties, or discussed herein.

[4]     This record notes the "date of admission" as March 10, 2016.  (Tr. 378.) However, the evaluator dated her signature March 9, 2016.  (*Id*. at 384.)

3

neat and well-groomed, with less sad mood and constricted affect, logical thought processes, and normal speech.  (*Id.* at 401.)

On August 2, 2016, Conrad returned to Nurse Ragon, and reported that since her May appointment she had been feeling more depressed and anxious.  (*Id.* at 396.)  She also reported starting a new job selling health insurance for Trubridge on June 6, 2016.  (*Id.*)  She was tearful at her appointment, and reported crying uncontrollably at work.  (*Id.*)  She was unable to return to work until a medical questionnaire that identified any accommodations she may need under the Americans with Disabilities Act was completed.  (*Id.*)  She reported that her Ativan knocked her out and made her sleep.  (*Id.*)  Nurse Ragon noted Conrad was neat and well-groomed, with less sad mood and constricted affect, logical thought processes, and normal speech.  (*Id.* at 397.)

On August 9, 2016, Conrad returned to Nurse Ragon and reported feeling anxious, nauseous, dizzy, and experiencing a bout of hysterical crying after a hearing for her pending divorce was postponed.  (*Id.* at 393.)  Nurse Ragon noted Conrad was neat and well-groomed, with sad mood and constricted affect, organized thought processes, and normal speech.  (*Id.* at 394.)

On August 31, 2016, Conrad returned to Nurse Ragon and reported feeling very tired, and losing her job at Trubridge because the company was unable to accommodate her need for intermittent absences.  (*Id.* at 390.) She reported Prozac was "much better" than Effexor.  (*Id.*)  Nurse Ragon noted Conrad was neat and well-groomed, with sad mood and constricted affect, organized thought processes, and normal speech.  (*Id.* at 391.)

On September 27, 2016,[5] Conrad returned to Nurse Ragon and reported feeling tired all day.

---

[5]     Plaintiff's Brief mis-dates many of the CommQuest Services appointment because she is relying on the dates that Nurse Ragon signed the records, which often occurred days after the date of the medical service.  For example, Conrad

(*Id.* at 387.)  She had applied and interviewed for a job, and her counselor was putting in a referral for supportive employment services through CommQuest Services.  (*Id.*)  She needed medication refills, but had not established care with a medical doctor after her previous physician left the practice.  (*Id.*)  Nurse Ragon noted Conrad was neat and well-groomed, with brighter, fuller affect, organized thought processes, and normal speech.  (*Id.* at 388.)

On January 18, 2017, Conrad returned to Nurse Ragon and reported that she still felt depressed, and was "sad more often than not." (*Id.* at 385.)  She arrived to her appointment 25 minutes late, and reported days when she does not get out of bed due to depression.  Nurse Ragon noted Conrad was neat and well-groomed, with depressed and anxious mood, constricted and blunted affect, racing thoughts at times, and normal speech.  (*Id.*)  Abilify was added to her medication regimen. (*Id.* at 386.)

On October 25, 2017, Dr. Natalie Meyer, Psy.D, performed a consultative examination of Conrad. (*Id.* at 628 33.)  Dr. Meyer noted that Conrad was cooperative, functioned in the average intellectual range, and had clear and logical thought processes, a wide range of affect and an appropriate mood, and no autonomic or motor indications of anxiety.  (*Id.* at 631.) Dr. Meyer opined that Conrad's symptoms of anxiety may lead to decreased attention and concentration skills, and that work pressure may increase her depressive symptomology, which included tearfulness, withdrawal from others, slowed work performance, and poor frustration tolerance. (*Id.* at 633.)

On February 28, 2018, Conrad resumed treatment at CommQuest.  (*Id.* at 720.)  Her primary

---

refers to an appointment with Nurse Ragon that occurred on October 9, 2016. (Doc. No. 14 at 8.)  The cited record shows the appointment occurred on September 27, 2016, but the record was signed by Nurse Ragon on October 9, 2016.  (Tr. 389.)

5

care physician had recommended that she return for treatment due to the severity of her symptoms. (*Id.* at 732.)   Conrad stated that she wished to resume services because "Depression is very prominent in my everyday life. I have suffered with depression and anxiety since I was a child. I was in a really bad marriage. I am a freaking hot mess. The divorce put me way over the edge. There was 3 months where I didn't leave the house." (*Id.* at 721-22.)  She reported having not worked in over two years because she could not function due to depression.  (*Id.* at 724.)  On examination, she was clean and alert, with good eye contact, concentration, insight and memory, normal speech, logical thought process, depressed mood, and appropriate affect.  (*Id.* at 728.)

On March 28, 2018, Conrad returned to Nurse Ragon and reported her moods were "on and off," and she was feeling overwhelmed due to the number of doctor appointments she has to attend. (*Id.* at 716.)  She missed her previous counseling session because she was too depressed to come in. (*Id.*)   Nurse Ragon noted Conrad was dressed appropriately, casually groomed, alert, calm, cooperative, with depressed mood, blunted affect, good memory, good insight, logical thought process and associations, and normal speech.  (*Id.*)

On April 24, 2018, Conrad returned to Nurse Ragon and reported lack of energy, lack of motivation, and pain after two teeth had been extracted.  (*Id.* at 713.)  Nurse Ragon noted Conrad was dressed appropriately, casually groomed, alert, calm, cooperative, with depressed mood, congruent affect, good memory, good insight, logical thought process and associations, and normal speech.  (*Id.*)

On May 15, 2018, Conrad was seen by a different CommQuest provider,[6] and identified a recovery goal of working on her anxiety and being more present." (*Id.* at 710.)   Her provider

---

[6]      The name and credential of this provider are illegible.  (Tr. 712.)

developed a plan to support these goals with Cognitive-Behavioral Therapy. (*Id.* at 711.)

On July 17, 2018, Conrad returned to Nurse Ragon and reported continuing to feel depressed, high levels of anxiety, frequent panic attacks, and gastrointestinal issues causing pain when she eats. (*Id.* at 706.) Nurse Ragon noted Conrad was dressed appropriately, casually groomed, alert, calm, cooperative, with anxious mood, congruent affect, good memory, good insight, fair concentration, logical thought process and associations, and normal speech. (*Id.*)

On September 26, 2018, Conrad returned to Nurse Ragon and reported feeling more depressed than usual over the last two months, having moderate to severe anxiety, not sleeping well, and having a lot of arthritis pain. (*Id.* at 792.) She reported she no longer drank alcohol because she realized alcohol made her symptoms worse. (*Id.*) Nurse Ragon noted Conrad was dressed appropriately, casually groomed, alert, calm, cooperative, with depressed mood and affect, good memory, good insight, poor concentration, logical thought process and associations, and normal speech. (*Id.* at 793.)

On October 17, 2018, Conrad returned to Nurse Ragon and reported continued severe depression. (*Id.* at 788.) Nurse Ragon noted Conrad was dressed appropriately, had lost weight, was casually groomed, alert, and cooperative, with depressed mood and affect, good memory, good insight, fair concentration, logical thought process and associations, and normal speech. (*Id.*)

On December 7, 2018, Conrad was reassigned to Tara Davis, CNP, for medication management at CommQuest Services. (*Id.* at 783.) She reported severe depression, and a lot of physical pain due to arthritis and fibromyalgia, but reported she was sleeping better. (*Id.*) Her previous provider stopped her Prozac and began her on Latuda, but she reported no change in her depression, so Adderall was added to her medication regimen. (*Id.*) On examination, Nurse Davis

noted Conrad was dressed appropriately, casually groomed, alert, and cooperative, with depressed mood, blunted affect, good memory, good insight, unremarkable thought process, and normal speech. (*Id.* at 784.)

On January 29, 2019, Conrad returned to Nurse Davis and reported her depression had lifted somewhat since her last appointment.  (*Id.* at 888.)  On examination, Nurse Davis noted Conrad was dressed appropriately, well-groomed, alert, and cooperative, with anxious, irritable affect, good memory, good insight, blocking thought process, and normal speech.  (*Id.* at 889.)

On March 13, 2019, Conrad returned to Nurse Davis and reported Adderall was beneficial, but her depression was continuous, and her anxiety remained moderate to severe. (*Id.* at 884.)  She described her days as "more of a panic," reported she does not want to leave the house at times., and sometimes she cannot get to the mailbox.  (*Id.*)   Her parents end up doing her grocery shopping. (*Id.*)  On examination, Nurse Davis noted Conrad was dressed appropriately, well-groomed, alert, and cooperative, with depressed mood, blunted affect, good memory, good insight, blocking and unremarkable thought process, and normal speech.  (*Id.* at 885.)

**C.     State Agency Reports - Mental Impairments**

On April 5, 2017, State Agency psychological consultant Robert Baker, Ph.D., reviewed Conrad's record and opined that she had the following abilities:

- •     able to concentrate sufficiently for the completion of 1-4 step tasks;

- •     may need occasional flexibility with breaks when experiencing increased symptoms;

- •     able to work in a nonpublic setting involves occasional and superficial interactions with others; and

8

- •      may need advance notice of major changes, which should be gradually implemented allowing her time to adjust to them.

(*Id.* at 121-23, 133-35.)

On November 9, 2017, State Agency psychological consultant Vicki Warren, Ph.D., reviewed the record and concurred with Dr. Baker's opinion.  (*Id.* at 150-52, 165-67.)

**D.**      **Hearing Testimony**

During the April 16, 2019 hearing, Conrad testified to the following:

- •      She is a right-handed high school graduate, who is 5 feet and one half inch tall, and weighs 207 pounds.  (Tr. 83.)

- •      She has a driver's license and lives alone in North Canton.  (*Id.* at 83-4.)

- •      She has no children.  (*Id.* at 84.)

- •      Her current medications are Cymbalta, Wellbutrin, blood pressure medication, Trazodone, Neurotin, Zanaflex, Adderall, magnesium oxide, Singulair, and vitamin D3.  She does not currently experience any side effects from the medications.  (Tr. 84-7.)

- •      Her fibromyalgia causes daily pain that fluctuates in intensity.  Activity can make it much worse.  She has pretty severe joint pain and some low-back pain, as well as pain in her ankles and feet. Cymbalta helps a little bit. (*Id.* at 87-8.)

- •      On a good day she can get her dishes done and cook a meal, or even get out to pick up prescriptions, visit the doctor, or grocery shop. (*Id.* at 89.)

- •      On a bad day, she has a hard time getting out of bed.  She takes medication, and uses a heating pad and TENS unit to try to relieve the pain.  Sometimes she ends up in bed all day.  She estimates that she has two really bad days a week.  (*Id.* at 89-90.)

- •      She has a hard time sleeping, even with the medications.  Some days she only gets a couple of hours of sleep.  A good sleep lasts five straight hours.  (*Id.* at 91.)

- •      She typically naps during the day, depending on her pain and depression.  (*Id.* at 92.)

- •      She is still receiving pain management care.  She has gotten trigger point injections,

but they didn't help as much as she expected.  She also has SI joint injections, and those were effective enough that she plans to get more.  (*Id.*)

- She smokes half a pack of cigarettes a day, and takes Singulair in pill form for her allergies.  (*Id.* at 94.)

- She stopped receiving mental health counseling six or seven months ago, because her counselor left the facility, and she felt it was sometimes doing more harm than good.  She is still seeing her psychiatric Nurse Practitioner.  (*Id.* at 94-5.)

- She feels medications make her mental health issues a little bit better.  (*Id.* at 95.)

- Her depression and anxiety are worse when her pain is worse.  Pain also makes her blood pressure go up.  (Tr. 96.)

- Her depression and anxiety make her feel very sad and lonely.  She has clusters of panic attacks, and feels like she wants to close off from everybody, stay in her house, and stop everything.  She often stays in bed.  (*Id.* at 96-7.)

- She has panic attack episodes two or three times a week.  During a panic attack, she feels lightheaded, short of breath, dizzy, and euphoric.  Things "go a little bit blurry."  (*Id.* at 97-8.)

- She does the best she can with household chores, and she gets a lot of help.  Her parents come over often, sometimes grocery shop for her, and bring her meals once or twice a week.  When she is preparing her own food, she keeps it very, very simple.  (*Id.* at 98-9.)

- She doesn't currently drive, because her license was suspended and then her car stopped working, so her mother takes her to all her doctor's appointments.  (*Id.* at 99.)

- Her last job was working as a state-certified insurance agent.  She stopped working because her physical and mental issues were coming into huge play at work.  She couldn't take the stress and intensity of the job.  (*Id.*)

- She was fired from multiple jobs in 2015 and 2016 because of missed days.  She was missing five to eight days of work a month because of depression and pain. (*Id.* at 100-1.)

- She also has extreme fatigue.  She takes at least one nap a day, lasting anywhere from one to three hours.  (*Id.* at 101.)

- Her arthritis and fibromyalgia make her hands swollen and very achy. She also has eczema, which can breakout on her hands and make the inflammation worse. Her wrists also hurt a lot, and she treats them with heat or ice. She has trouble opening a jar, and had to get an electric can opener. (*Id.* at 102.)

- She gets headaches about twice a week. She also gets migraines maybe once a month where its debilitating. She has to stay in bed with the lights off, and can't function. (*Id.* at 103.)

- She has racing thoughts due to her anxiety, can have trouble keeping a thought or getting the right words out, and randomly forget things like her computer password. (*Id.*)

- She can walk a few minutes before she gets severe low back pain and her feet and ankles hurt and ache. (*Id.* at 104.)

- She can lift maybe eight pounds. (*Id.*)

- She can sit for 20 or 30 minutes before she starts to get cramping in her low back, shoulders, ankles and feet, and throbbing through her legs. (*Id.* at 104-5.)

- She sometimes has trouble raising her hands above her head, and can stand 10 or 15 minutes before she needs to sit down. (*Id.* at 105.)

The ALJ chose to exclude any prior work performed by Conrad, and posed the following hypothetical question:

Please consider a younger individual with a high-school education under the regulations. No skills from any past work that would transfer to these hypotheticals. First . . . consider an individual that can lift, carry, push, and pull 20 pounds occasionally and 10 pounds frequently; with sitting, standing, and walking at six out of eight hours in a normal workday. This person cannot climb ladders, ropes, or scaffolds, and occasionally climb ramps and stairs. This person can occasionally kneel, crouch, crawl, and stoop. This individual must avoid concentrated exposure to temperature extremes of cold. This individual must avoid workplace hazards, such as unprotected heights or exposure to dangerous moving machinery. This individual is further limited to simple, routine, repetitive tasks that do not include arbitration, negotiation, or confrontation. The hypothetical individual cannot direct the work of others and cannot be responsible for the safety or welfare of others. The hypothetical individual cannot perform piece-rate or assembly-line work and would also be limited to only occasional interaction with others.

(*Id.* at 107-8.)

11

The VE explained the hypothetical individual would be able to perform representative jobs in the economy, such as mail clerk, price marker, and office helper.  (*Id.* at 108-9.)

Next the VE amended the hypothetical to add the limitation that, because of pain and difficulty concentrating, the hypothetical individual would be off-task in the work setting 20 percent of the day, each and every day on an ongoing basis.  (*Id.* at 109.)  The VE testified that this would preclude competitive work, because 10 percent of the workday was the threshold for off-task behavior.  (*Id.*)

Third, the ALJ again amended the first hypothetical to add the limitation that the individual was going to be absent from work at least four days a month on an ongoing basis.  (*Id.* at 109-10.)  Again, the VE testified that this would preclude competitive work, because twice a month was the threshold for absence, including arriving late and leaving early.  (*Id.* at 110.)

Fourth,  the ALJ amended the first hypothetical to add the limitation that the individual could not interact at all with the public or with coworkers and could occasionally interact with supervisors.  (*Id.*)  The VE testified this level of isolation would also preclude competitive work.  (*Id.*)

In response to questioning from Conrad's counsel, the VE testified that if the first hypothetical was amended to add the limitation that the individual could only occasionally reach, handle, and finger, this would also preclude competitive employment.  (*Id.* at 111.)

### III.  STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can

be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 & 404.1505(a).

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 & 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) & 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010);  *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b) & 416.920(b).  Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) & 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) & 416.920(d).  Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) & 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), & 416.920(g).

13

Here, Conrad was insured on her alleged disability onset date, June 15, 2016, and remains insured through March 31, 2021, her date last insured ("DLI.")  (Tr. 25.)  Therefore, in order to be entitled to POD and DIB, Conrad must establish a continuous twelve-month period of disability commencing between these dates.  Any discontinuity in the twelve-month period precludes an entitlement to benefits.  *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 31, 2021.

2.    The claimant has not engaged in substantial gainful activity since June 15, 2016, the alleged onset date.

3.    The claimant has the following severe impairments:  fibromyalgia, inflammatory arthritis, obesity, hypertension, pseudotumor cerebri, major depression, bipolar disorder, generalized anxiety disorder, and panic disorder.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing ladders, ropes, or scaffolds; Occasionally climb ramps and stairs; Occasionally kneel, crouch, crawl, and stoop; Avoid concentrated exposure to cold; Avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; Simple, routine, repetitive tasks that do not include arbitration, negotiation, or confrontation; No directing the work of others or being responsible for the safety or welfare of others; No piece rate work or assembly line work; and Occasional interaction with others.

6.    The claimant is unable to perform any past relevant work.

7.      The claimant was born June, ** 1977 and was 38 years old, which is defined as a younger individual age 18-49, on the alleged disability date.

8.      The claimant has at least a high school education and is able to communicate in English.

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills.

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.     The claimant has not been under a disability, as defined in the Social Security Act, from June 15, 2016, through the date of this decision.

(Tr. 25-33) (internal citations omitted).

## V.  STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not

review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence

16

in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996); accord *Shrader v. Astrue*, No. 11 13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10 cv 734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10 CV 017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09 cv 1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

Conrad asserts that the ALJ erred because his decision is not supported by substantial evidence.  (Doc. No. 14 at 11.)  She argues the ALJ failed to explain why case-determinative limitations included in the medical opinions of the State Agency psychological consultants were not included in the ALJ's determination of RFC, in violation of Social Security Ruling ("SSR") 96-8p. (*Id*.)

The Commissioner responds that the ALJ reasonably weighed the opinion evidence, based on the controlling regulations, and thoroughly analyzed the objective medical evidence, all of which constitutes substantial evidence that supports his RFC findings.  (Doc. No. 17 at 5-7.)

The RFC determination sets out an individual's work-related abilities despite their limitations.  *See* 20 C.F.R. § 416.945(a).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the

Commissioner."  *See* 20 C.F.R.§ 416.927(d)(3).[7]  As such, the ALJ bears the responsibility for

assessing a claimant's RFC, based on all of the relevant evidence.  *See* 20 C.F.R. § 416.946(c).

"Judicial review of the Commissioner's final administrative decision does not encompass

re-weighing the evidence." *Carter v. Comm'r of Soc. Sec*., 2012 WL 1028105 at *7 (W.D. Mich.

Mar. 26, 2012) (citing *Mullins v. Sec'y of Health & Human Servs*., 680 F.2d 472 (6th Cir. 1982);

*Reynolds v. Comm'r of Soc. Sec*., 424 F. App'x 411, 414 (6th Cir. 2011); *Vance v. Comm'r of Soc.

Sec*., 260 F. App'x 801, 807 (6th Cir. 2008)).

     With respect to agency reviewing physicians' opinion, an ALJ must weigh their opinions

under the same factors[8] as treating physicians, including the supportability and consistency of the

opinions, as well as the specialization of the physician.  *See* 20 C.F.R. § 416.927.  However, ALJs

"are not bound by any findings made by State Agency medical or psychological consultants, or other

program physicians or psychologists." 20 C.F.R. § 404.1527(e)(2) (I).  Nonetheless, because "State

agency medical and psychological consultants and other program physicians, psychologists, and

other medical specialists are highly qualified physicians, psychologists," ALJs must consider their

findings and opinions.  *Id*.

---

[7]    Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date.  *See* 82 Fed. Reg. 5844 (March 27, 2017). Conrad's claim was filed on February 10, 2017, and the Court applies the regulations in effect at that time.  (Tr. 235.)

[8]    These factors include the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.  20 CFR §416.1527(c)(1)-(6).

At step four, the ALJ made the following RFC determination:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except no climbing ladders, ropes, or scaffolds; Occasionally climb ramps and stairs; Occasionally kneel, crouch, crawl, and stoop; Avoid concentrated exposure to cold; Avoid workplace hazards such as unprotected heights or exposure to dangerous moving machinery; Simple, routine, repetitive tasks that do not include arbitration, negotiation, or confrontation; No directing the work of others or being responsible for the safety or welfare of others; No piece rate work or assembly line work; and Occasional interaction with others.

(Tr. 28.)  In his discussion at step four, the ALJ assigned "great weight" to the State Agency reviewing psychologists, reasoning as follows:

> The State Agency consultants opined that the claimant is limited to light exertion, with no ladders, ropes or scaffolds, frequent climbing ramps and stairs, frequent kneeling, crouching, and crawling, and occasional stooping, with no concentrated exposure to extreme cold and no exposure to hazards.  They limited her to 1-4 step tasks and indicated she may need occasional flexibility with breaks when experiencing increased symptoms.  Work should be in a nonpublic setting involving only occasional and superficial interaction with others, and she would need advance notice of major changes, which should be gradually implemented allowing her to adjust to them.  These opinions are persuasive, as they are supported by the medical evidence of record, the noted activities of daily living, and the fact that no treating source finds greater limitations.

(Tr. 31) (internal citation omitted).

The ALJ noted that both State Agency psychological consultants who reviewed the record had opined that Conrad had the following limitations:

- may need occasional flexibility with breaks when experiencing increased symptoms;

- able to work in a nonpublic setting involves occasional and superficial interactions with others; and

- may need advance notice of major changes, which should be gradually implemented allowing her time to adjust to them.

19

(*Id.* at 121-23, 133-35, 150-52, 165-67.) However, the RFC did not include any accommodation for these limitations. This is puzzling, because the ALJ did not identify any areas of disagreement with the State Agency reviewers in his decision.

It is well-settled that even when an ALJ accords "great weight" to a medical opinion, the ALJ is not required to adopt every facet of the opinion expressed by the medical source. *See Taylor v. Colvin*, 2013 WL 6162527 at *15 (N.D. Ohio Nov.22, 2013) (finding ALJ was not required to adopt every opinion of an ME "by virtue of the fact that, overall, he gave [the ME's] opinion great weight"). *See also White v. Comm'r of Soc. Sec.*, 2013 WL 4817673 at *16 (N.D. Ohio 2013) (noting that "[t]he fact that the ALJ did not incorporate all of Dr. Castor's restrictions, despite attributing significant weight to his opinion, is not legal error in and of itself"); *Smith v. Comm'r of Soc. Sec.*, 2013 WL 1150133 at *11 (N.D. Ohio Mar. 19, 2013) ("Simply put, there is no legal requirement for an ALJ to explain each limitation or restriction he adopts or, conversely, does not adopt from a non-examining physician's opinion, even when it is given great weight"). Thus, although the ALJ found the opinions of the State Agency reviewing psychologists "persuasive," he was not required to adopt the limitations verbatim or explain every deviation from the opinion.

However, Conrad argues that in noting no areas of disagreement with the State Agency psychological consultants opinions, yet failing to adopt significant portions of their opined limitations, the ALJ failed to meet his obligation to explain his reasoning under Social Security Ruling ("SSR") 96-8p. (Doc. No. 14 at 12.) SSR 96-8p requires that, "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted" *Id.*

at *7; *see also Moscorelli v. Colvin*, No. 1:15CV1509, 2016 WL 4486851, at *3 (N.D. Ohio Aug. 26, 2016) ("where the opinion of a medical source contradicts his RFC finding, an ALJ must explain why he did not include its limitations in his determination of a claimant's RFC"); *Stubbs v. Berryhill*, No. 1:17CV2498, 2018 WL 5255140, at *14 (N.D. Ohio Oct. 22, 2018) (same).  Applying SSR 96-8, courts in this district have held that an ALJ must explain why it did not include the limitations from an opinion of a medical source in determining the claimant's RFC.  *See, e.g., Horinek v. Saul*, No. 1:19-cv-2141, 2020 WL 4340987, at *10 (N.D. Ohio July 7, 2020) (noting "This [explanation] is particularly important where a State Agency psychologist assessed a restriction, the ALJ accords the author of that opinion "some weight" noting its general consistency with the record"), *report and recommendation adopted* 2020 WL 4339327 (N.D. Ohio July 28, 2020); *Moscorelli v. Colvin,* 2016 WL 4486851 at *3 (ALJ "must explain his reason for rejecting any part of the opinions of the state agency psychologist"); *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004); *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011)).  The ALJ does not need to provide, "good reasons" for rejecting non-treating source opinions, but he must acknowledge and explain the inconsistency in some manner.  *See Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) ("opinions from nontreating and nonexamining sources are never assessed for 'controlling weight' "); *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 876 (6th Cir. 2007) ("In the absence of treating-source status for these doctors, we do not reach the question of whether the ALJ violated *Wilson* by failing to give good reasons for not accepting their reports.")

In this case, the ALJ failed to meet that lenient standard, because he did not acknowledge that he was deviating significantly from the opined limitations of the State Agency reviewing psychologists, and his discussion of their opinions suggests he found them entirely consistent with

the other evidence of record.  The Commissioner acknowledges this, but argues that Conrad's argument should be dismissed because her brief "pointed to no objective evidence demanding the conclusion that she was limited to work in a nonpublic setting with only superficial interaction with others." (Doc. No. 17 at 6.)  This misrepresents her argument as one which asks the Court to re-weigh the evidence.  Clearly, there is enough evidence in the record of this case to support such a conclusion, because both State Agency reviewing psychologists adopted that limitation.[9]  However, the issue that Conrad raises is the ALJ's failure to create "a logical  bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011).  This assignment of error is valid, because one cannot explain what one fails to acknowledge.

The Commissioner also asserts that, elsewhere in his decision, the ALJ cited record evidence that substantially supports his RFC determination, and argues this evidence supports the ALJ's treatment of the State Agency reviewing psychologists' opinions.  (Doc. No. 17 at 4-6.)  He argues "That objective evidence, as documented by the ALJ but which Plaintiff ignores, explains why the ALJ did not adopt the medical consultants' opinions despite finding them persuasive." (*Id*. at 6.)  However, it is evident from the differing opinions offered in this case that the objective evidence is open to multiple interpretations, and it is not clear from the ALJ's decision whether he deliberately omitted the opined limitations or simply overlooked them.

Further, this Court is not permitted to make inferences from the cited evidence to rationalize the ALJ's decision, especially where, as in here, those inferences are in direct conflict with the ALJ's

---

[9]     Further, relevant evidence supporting this conclusion was set forth in the appropriate section of her brief. (Tr. 14 at 4-10.)

22

own statements about his reasoning. The ALJ explained that the State Agency reviewing psychologists' "opinions are persuasive, as they are supported by the medical evidence of record, the noted activities of daily living, and the fact that no treating source finds greater limitations." (Tr. 31.)  The Commissioner attempts to rationalize the discrepancy between those opinions and the ALJ's RFC by explaining that the opinions are in fact inconsistent with the record evidence and Conrad's activities of daily living.  The Commissioner cannot cure a deficient opinion by offering explanations that were not offered by the ALJ.  As courts within this district have noted, "arguments [crafted by defense counsel] are of no consequence, as it is the opinion given by an administrative agency rather than counsel's '*post hoc* rationale' that is under the Court's consideration." *See, e.g., Blackburn v. Colvin*, No. 5:12CV2355, 2013 WL 3967282 at *8 (N.D. Ohio July 31, 2013); *Cashin v. Colvin*, No. 1:12 CV 909, 2013 WL 3791439 at *6 (N.D. Ohio July 18, 2013); *Jaworski v. Astrue*, No. 1:10 CV 02936, 2012 WL 253320 at *5 (N.D. Ohio Jan. 26, 2012).  Here, the explanation advanced by the Commissioner is not only a *post hoc* rationale, it contradicts the reasoning set forth in the ALJ's decision.  Accordingly, this Court cannot accept the Commissioner's *post hoc* rationalizations.

The ALJ was neither required to adopt all the elements of the State Agency reviewing psychologists' opinions, nor explain every discrepancy between the RFC he adopted and their proposed limitations.  However, he was required to coherently explain his treatment of the opinions, and he failed to do so.  Therefore, this case should be remanded to afford the ALJ the opportunity to explain why he chose to exclude the majority of the opined limitations in the State Agency reviewing psychologists' opinions, which he found  persuasive and supported by the medical

23

evidence of record and the noted activities of daily living.

## VII.  CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED AND REMANDED FOR FURTHER CONSIDERATION CONSISTENT WITH THIS OPINION.  On remand, the ALJ should acknowledge his decision to omit from his RFC determination the State Agency psychologists' opined limitations regarding Conrad's need for breaks, ability to work in a nonpublic setting involving occasional and superficial interactions with others; and need for advance notice of major changes, which should be gradually implemented allowing her time to adjust to them, and provide an accurate and logical explanation for this decision.


*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: May 19, 2021


## OBJECTIONS
**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**